IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

THERESA ZORBAH                           :
                                         :       CIVIL ACTION
        v.                               :       No. 12-3119
                                         :
THE SCHOOL DISTRICT OF THE CITY          :
OF PHILADELPHIA, et al.                  :

O'NEILL, J.                                                              February 10, 2014

## MEMORANDUM

Now before me is a motion for summary judgment by defendants the School District of Philadelphia and School District Police Officer Adrienne Holmes, plaintiff Theresa Zorbah's response and defendants' reply. Plaintiff brings a Fourth Amendment excessive force claim and state law claims of assault and battery allegedly arising out of defendant Holmes's actions leading to plaintiff's arrest and detention on or about June 4, 2010.[1] For the reasons below, I will deny defendants' motion.

## BACKGROUND

On or about June 4, 2010, plaintiff Theresa Zorbah, then a student at Fels High School arrived at summer school at approximately 8:00 a.m. Dkt. No. 11-2 at 13:6-7, 28:12-14. Plaintiff was pregnant at the time. Id. at 26:21-22. Plaintiff entered her first period class and asked for permission to go to the library to speak to a representative from City Year in order to ask questions about applying to the program. Id. at 31:20-32:6. Her substitute teacher gave her permission to leave the classroom but could not give her a pass. Id. at 38:1-2. Plaintiff walked to and entered the library. Id. at 32:10-12. Plaintiff recalls that the librarian was absent when

---

[1] Plaintiff has abandoned her claims against the School District of Philadelphia and any claims arising under the Fourteenth Amendment. Dkt. No. 12 at ECF p. 3. She has also abandoned her state tort claims for false arrest, malicious prosecution and intentional infliction of emotional distress. Id.

she arrived and school police officer Adrienne Holmes had been asked to "take over" and was "covering" for the librarian until her return. See id. at 79:16-80:3. Plaintiff claims that Holmes approached her while she was pleading to go meet a City Year representative but Holmes refused her appeals multiple times.[2] She claims that Holmes then grabbed her by her jacket and told her to turn around to leave the library.[3] Id. at 39:13-16. Plaintiff continued to insist to Holmes that she needed to talk to City Year. See id. at 39:16-17. At this point, Holmes started to turn

---

[2] Plaintiff testified that she was told several times by Holmes to leave the library but did not. She explained: "What happened when [Holmes] had told me no I was still standing in the same place I was standing and I kept on asking her, pleading with her so she can let me in to talk to City Year. And she constantly said no." Dkt. No. 11-2 at 39: 6-10. See id. at 32:12-23. The following relevant parts of her deposition also indicate that plaintiff deliberately disregarded Holmes's requests:

> Q. So when Officer Holmes told you to leave the library why didn't you just go back out the door to the library?
> A. Because I wanted to talk to City Year.
> Q. Okay. But you had been told several times that you were not going to be able to do that, right?
> A. Yes.
> Q. So having been told that several times why didn't you then obey the instructions and turn around and leave the library?
> A. I don't know.
>
> ***
>
> Q. How would you describe your state of mind when [Holmes] came towards you? Were you very angry?
> A. No. I was calm. I was standing there. And when she came to approach me she told me I have to leave. And I wasn't doing anything. I was just standing there.
> Q. But you didn't leave?
> A. No. And she was still standing in front of me and she told me I had to leave. And I told her that I needed to talk to City Year. And she said you have to leave. So while we were having the conversation back and forth she just grabbed me by my jacket.

Dkt. No. 11-2 at 42:12-24; 43:5-18.

[3] "And what happened next was she told me I had to leave. So when she came towards me she had grabbed me by my jacket and told me to turn around to go back outside [the library]. And I told her that I have to talk to City Year." Dkt. No. 11-2 at 39:13-17.

plaintiff around by her jacket to face the door in order to leave the library while plaintiff claims she told Holmes to "let go" and "stop." Id. at 46:1-9. Plaintiff claims that Holmes then pushed her until they were in a corner near the library door.[4] Id. at 39:17-23. Plaintiff claims that while they were against the wall Holmes continued to push her until she made herself "stiff." Id. at 52: 8-16. She testified that when Holmes "realized that she couldn't push [her] no more she grabbed [her] by [her] hair" and then bent her over her stomach. Id. at 40:7-41:11. Plaintiff claims she grabbed defendant's jacket "by her neck" to pull herself up, held both of Holmes's hands and struggled with her. Id. at 41:6-9; 47:16-21; 60:2-18. Plaintiff also claims that her friend, a bystander, requested that Holmes "let her go, leave her" because she was pregnant, but Holmes responded that she didn't give a f--. Id. at 40:16-23. Plaintiff testified that Holmes asked a nearby officer to "help get [her]" but that officer refused to touch her because she was pregnant. Id. at 40:12-17. Plaintiff testified that she never kicked Holmes. Id. at 47:13-19. Plaintiff's testimony is generally corroborated by another student who witnessed the incident.[5] See Dkt.

---

[4] Plaintiff testified as to the following:

> So [Holmes] started pushing and I told her can you stop pushing me. I will leave. You need to stop pushing me. And she said no you have to leave. And I was like stop pushing me [but] she kept on pushing me—and I make myself—when she kept on pushing me she pushed me toward the corner it is like a corner right to the door. So she had pushed me into the corner and stuff. And I told her you need to stop pushing and she still kept on pushing and I made myself stiff. So when she realized she couldn't push me no more she grabbed me by my hair and ben[t] me over my stock and pulling me by my hair to get out of the library. So I told her to let go and she couldn't let go.

Id. at 39:16-40:7; see also id. at 51:8-14.

[5] The student witness testified:

> The [plaintiff] came into the library and said "I need to ask [a] question" and the officer jumps out of her seat and said "you can't

No. 12-5.

In contrast, Holmes testified that plaintiff of her own volition "had backed up against the wall" prior to rushing defendant and "pushing, kicking" at the same time as she forcefully attempted to "get her way in" the library. Dkt. No. 12-2 at 27:3-15; 38:20-21. Holmes claims that she "probably did grab [plaintiff] by the head because she was pregnant" because "there was no where else to grab her." Id. at 32:21-23. Holmes testified that she had her hand on plaintiff's hair for approximately 30 seconds during the time she claimed plaintiff attempted to push her way into the library. Id. at 36:10-19. She testified that she never attempted to take plaintiff to the ground or try to bend her over. Id. at 36:20-24. She contends that she attempted to prevent plaintiff from entering the library because she was given instructions by the librarian not to allow any students inside. Id. at 24:10-12. She claims that she suffered visible injuries to her leg from plaintiff's kicking but did not file any reports. Id. at 42:1-9.

One of the additional school police officers handcuffed plaintiff and she was escorted to another room. See id. at 53:16-24; 55:2-5. The Philadelphia police were called to the high school and plaintiff was arrested and taken to the police station. Id. at 55:12-20; 62:12-63:9. Thereafter plaintiff was charged with aggravated assault, simple assault and recklessly endangering another person. Dkt. No. 1 ¶ 15. She spent the night at the police station and returned home the following morning on June 5, 2010. Dkt. No. 11-2 at 68:11-14. The next day, plaintiff went to the Aria Health Frankford Campus emergency room, was examined, told

---

come in here" and she walked up to the girl and started pushing her and the girl said "stop" and the officer kept pushing her and the girl said "I need to ask [a] question" and the officer repeated, "no you can't be in here" and pushed her against a wall and start[ed] to [sic] yanked the girl's hair until her pony tail fell off . . . .

Dkt. No. 12-5.

everything was fine, given Tylenol and then discharged.  Id. at 71:12-72:6.  The rest of her pregnancy progressed well and her baby was delivered "normally" on September 19, 2010.  Id. at 72:18-73:3.  On or about December 8, 2010, all charges against plaintiff were withdrawn by the Philadelphia District Attorney's Office after plaintiff completed a program that required her to attend anger management classes and perform community service.  Id. at 75:14-76:23.

## STANDARD OF REVIEW

Summary judgment will be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, [and on] which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The party moving for summary judgment bears the burden of demonstrating that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see Celotex, 477 U.S. at 322-23.  If the movant sustains its burden, the nonmovant must set forth facts demonstrating the existence of a genuine dispute.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  A dispute as to a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.  A fact is "material" if it might affect the outcome of the case under governing law.  Id.

> To establish "that a fact cannot be or is genuinely disputed," a party must:
>
> > (A) cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> >
> > (B) show[ ] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  The adverse party must raise "more than a mere scintilla of evidence in its favor in order to overcome a summary judgment motion and cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions.  Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989).  The "existence of disputed issues of material fact should be ascertained by resolving all inferences, doubts and issues of credibility against" the movant.  Ely v. Hall's Motor Transit Co., 590 F.2d 62, 66 (3d Cir. 1978) (citations and quotation marks omitted).

## DISCUSSION

I.  **Fourth Amendment Excessive Force Claim**

    A.  **Standard to Apply**

The facts in this case and plaintiff's argument indicate that the specific constitutional violation at issue is her Fourth Amendment right against excessive force used during the course of effecting an arrest.[6]  See Dkt. No. 12 at ECF p. 9.  The parties disagree on the correct standard to apply to plaintiff's excessive force claim.  Here, "[i]dentification of the specific constitutional right allegedly infringed is essential because the standard against which the defendant's conduct is to be assessed depends upon the right that is purportedly violated."  Kurilla v. Callahan, 68 F. Supp. 2d 556, 559 (M.D. Pa. 1999).

All claims that law enforcement officers have used excessive force in the course of a "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard.  Graham v. Connor, 490 U.S. 386, 395 (1989).  The Fourth Amendment prohibition on unreasonable searches and seizures applies to public school students.

---

[6] Plaintiff concedes she has not produced evidence sufficient to make out a Fourteenth Amendment substantive due process violation.  Dkt. No. 12 at ECF pp. 7-8.

See New Jersey v. T.L.O., 469 U.S. 325, 333 (1985).  Specifically, "seizures in the public school context [are] to be governed by the reasonableness standard, [while] giving special consideration to the goals and responsibilities of [ ] public schools."  Shuman ex rel. Shertzer v. Penn Manor Sch. Dist., 422 F.3d 141, 148 (3d Cir. 2005).  The special consideration is "consistent with the reduced liberty interest afforded students in the public school setting" whereby students are compelled to attend school in the first place and are under the control and direction of teachers and administrators while there.  Id. at 149.

> [W]hen a school official is acting in a way which may be described as an administrative function, T.L.O. controls.  The reasonableness of a Fourth Amendment seizure of a public school student . . . must be evaluated in the context of the school environment; only when the restriction of liberty is unreasonable under the circumstances then existing and apparent will there be a violation of the Fourth Amendment.

Leach ex rel. Dyson v. Principal Baum, No. 04-135, 2004 WL 834732, at *2 (E.D. Pa. Apr. 16, 2004) (citation omitted).

Defendants argue that plaintiff has not proved a Fourth Amendment excessive claim because her claim does not meet the "shocks the conscience" standard applicable to such claims. Dkt. No. 13 at ECF p. 3, citing Cherry v. Garner, No. 03-CV-01696, 2004 WL 3019241, at *5 (E.D. Pa. Dec. 30, 2004).  The shocks the conscience standard is a more demanding standard than the reasonableness standard.  It requires that the "force applied caused injury so severe, was so disproportionate to the need presented, and was so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience."  Gottlieb ex rel. Calabria v. Laurel Highlands Sch. Dist., 272 F.3d 168, 172 (3d Cir. 2001).  The Court of Appeals has instructed that the shocks the conscience standard applies to claims regarding the "conditions of ongoing

custody following [a] curtailment of liberty" that "invoke[] principles of substantive due process." Id. at 171-72 (quotation marks and citations omitted). In contrast, the reasonableness standard applies to infractions that deal with "the initial decision to detain" and "the curtailment of liberty that such a decision necessarily entails." Id. The shocks the conscience test is thus the incorrect test to apply to plaintiff's Fourth Amendment claims of excessive force. See id.; Shuman, 422 F.3d at 148. Plaintiff has made clear that she concedes any substantive due process claims and her only federal claim is a Fourth Amendment excessive force claim associated with the initial decision to detain. Dkt. No. 12 at ECF pp. 7-8. Therefore, I will apply the reasonableness standard to plaintiff's claims. See Shuman, 422 F.3d at 149 ("We thus turn to the question of whether the school's seizure of [the plaintiff] was reasonable in light of the circumstances."); Valentino C. v. Sch. Dist. of Phila., No. 01-2097, 2003 WL 177210, at *5 (E.D. Pa. Jan. 23, 2003) (applying the reasonableness standard to a Fourth Amendment claim of unreasonable detention).

Plaintiff cites to the decisions in Graham and Sharrar v. Felsing, 128 F.3d 810 (3d Cir. 1997) for the factors I should use in assessing the reasonableness of the amount of force used against her by school officer Holmes. See Dkt. No. 12 at ECF pp. 9-10. While the Graham and Sharrar factors[7] are appropriate in the context of traditional police investigatory searches and seizures, courts have not applied them in the school environment. See Shuman, 422 F.3d at 147-50 (discussing and applying the reasonableness standard to a seizure claim in the public school

---

[7] These factors are: (1) the severity of the crime at issue; (2) whether the suspect posed an emanate threat of the safety of the officer or others; (3) whether he was actively resisting arrest or attempting to evade arrest; (4) whether the physical force applied was of such an extent as to lead to injury; (5) whether the suspect was himself violent or dangerous; (6) the duration of the officer's action; (7) whether the action took place in the context of effecting an arrest; (8) the possibility that the suspect may be armed; and (9) the number of persons whom officers must contend at one time. See Graham, 490 U.S. at 395; Sharrar, 128 F.3d at 822 abrogated on other grounds by Curley v. Klem, 499 F.3d 199 (3d Cir. 2007).

context without reference to or application of the Graham and Sharrar factors); Kurilla, 68 F. Supp. 2d at 560-63 ("Factually, Graham is limited to claims against law enforcement officers engaged in law enforcement activities" and quoting the Seventh Circuit's holding that "[t]he basic purpose for the deprivation of a student's personal liberty by a teacher is education, while the basic purpose for the deprivation of liberty of a criminal suspect by a police officer is investigation or apprehension . . . [so] application of the Fourth Amendment is necessarily different" in the school context.), citing Wallace v. Batavia Sch. Dist., 68 F.3d 1010, 1013-14 (7th Cir. 1995) (emphasis in original).

Defendants argue that plaintiff was not seized since Holmes was not intending to arrest plaintiff, but merely prevented her from "doing more harm and plaintiff could have left the library and prevented any further incidents." Dkt. No 13 at ECF p. 2. A person is "seized" under the Fourth Amendment if she does not feel free to leave. Shuman, 422 F.3d at 147. Whether or not Holmes intended to arrest plaintiff is not relevant to the analysis of whether Holmes used excessive force in the course of plaintiff's arrest. See Berg v. Cnty. of Allegheny, 219 F.3d 261, 272 (3d Cir. 2000) (noting in the context of Fourth Amendment § 1983 claim that "[a]s a general rule, a government official's liability for causing an arrest is the same as for carrying it out."). Based upon plaintiff's uncontroverted testimony that she was handcuffed in the library following the incident with Holmes, taken to a separate room and later charged and arrested, see Dkt. No. 11-2 at 53:16-24; 55:2-5; 55:12-20; 62:12-63:9, plaintiff was "seized" within the meaning of the Fourth Amendment. Whether the force used in plaintiff's seizure was reasonable under the circumstances is a question of factual dispute.

The testimonies of the parties regarding the events in the library diverge significantly. In this case plaintiff concedes that she refused multiple requests from Holmes to leave the library:

she refused Holmes's requests upon first entering the library, again after Holmes approached her and even after Holmes had allegedly grabbed her by her jacket and told her to turn around and leave the library.  See id. at 39:6-10; 39:13-17; 42:12-24; 43:5-18.  Plaintiff admittedly disobeyed the school police officer's requests for her to leave the library.[8]  Plaintiff admits that she at no time attempted to turn around and leave the library after being told multiple times to do so.[9]  Plaintiff claims that she informed Holmes that she would leave of her own volition while Holmes was turning her towards the door but her testimony does not indicate that she attempted

---

[8]
        Q.  Did you obey what the school police officer said to you
[to leave the library]?
        A. At that time?
        Q. Yes.
        A. No.

Dkt. No. 11-2 at 33:11-16.

[9]
        Q. At any point after Officer Holmes told you to leave the library did you ever turn around and try to leave the library?
        A. After she had grabbed me?
        Q. At any point.
        A. No.
        Q. Why is that?
        A. I don't know.

        ***

        Q. So when Officer Holmes told you to leave the library why didn't you just go back out the door to the library?
        A. Because I wanted to talk to City Year.
        Q. Okay. But you had been told several times that you were not going to be able to do that, right?
        A. Yes.
        Q. So having been told that several times why didn't you then obey the instructions and turn around and leave the library?
        A. I don't know.

Dkt. No. 12-12 at 48:17-24; 42:12-23.

to or moved towards the door.[10] She then admittedly resisted Holmes's continued attempt to eject her by making herself "stiff" until she was immovable.[11] Plaintiff concedes that Holmes then grabbed her hair for the purposes of "get[ing] [her] out the library" since she had by this time rendered herself immovable.[12] Plaintiff then responded to Holmes's action by grabbing her jacket near her collar. Plaintiff concedes that Holmes could not herself have broken free of plaintiff's hold at this time or release her in response to plaintiff's friend's request do so.[13] However, plaintiff denies that she attempted to force her way into the library or that she kicked Holmes. Id. at 47:13-16. See id. at 50:22-51:4.

Holmes presents a radically divergent account of the incident. She claims that plaintiff

---

[10]
> Q. What were you doing when she was trying to turn you around?
> A. I was just like shock like why would she grab me by my jacket if I was just like you need to stop. I am going to leave. You have to let go.
> Q. So when she grabbed you by your jacket and tried to turn you around and you said I am going to leave did you turn around and leave?
> A. No. She still had me by my jacket.
> Q. Were you cooperating with her when she was turning you around or were you fighting her?
> A. No. I wasn't fighting.

Dkt. No. 12-12 at 45:10-21.

[11]
> Q. If the officer has her hands on your jacket and she's trying to turn you around to leave, do you know why she then grabbed your hair?
> A. Because I had made myself stiff and she couldn't turn me anymore.

Dkt. No. 11-2 at 52:11-15.

[12] Plaintiff testified: "So when she [Holmes] realized she couldn't push me no more she grabbed me by my hair and ben[t] me over my stomach and pull[ed] me by my hair to get [me] out of the library. Dkt. No. 12-2 at 40:3-6.

[13] Plaintiff testified that "So my friend said stop she [plaintiff] is pregnant you [Holmes] have to let her go. So [Holmes] couldn't let me go. She still had me by my hair down and I still had her jacket up." Dkt. No. 11-2 at 40:24-41:3.

-11-

rushed at her "pushing, kicking" as she forcefully attempted to enter the library and caused her leg injuries. Dkt. No. 12-2 at 27:3-15; 38:20-21; 42:1-9. She claims that plaintiff grabbed her collar to move her out of plaintiff's way into the library so Holmes, in response, clutched plaintiff's head to keep her away. See id. at 32:17-24. Holmes testified that plaintiff pushed her for about 20 seconds before she gave up and walked of her own accord to the wall. Id. at 31:1-7. Defendants concede that there is a genuine dispute surrounding the circumstances of what actually happened in the library. Dkt. No. 11 at ECF p. 4. This dispute of facts regarding the both parties' actions, the amount of force Holmes used, and the purpose and duration of the force applied, renders summary judgment inappropriate.

      **B.**      **Qualified Immunity**

Holmes asserts that she is entitled to qualified immunity. Dkt. No. 11 at ECF p. 11. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009) (citation and quotation marks omitted). As the Supreme Court has explained, "[q]ualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Id. at 231. It requires that I ask (1) whether facts alleged or shown by plaintiff make out violation of constitutional right, and (2) if so, whether that right was clearly established at time of defendant's alleged misconduct. Saucier v. Katz, 533 U.S. 194, 201 (2001). In an excessive force case

> [T]he first step of the [qualified immunity] analysis addresses whether the force used by the officer was excessive, and therefore violative of the plaintiff's constitutional rights, or whether it was reasonable in light of the facts and circumstances available to the

-12-

>officer at the time. This is not a question of immunity at all, but is
>instead the underlying question of whether there is even a wrong to
>be addressed in an analysis of immunity. The second step is the
>immunity analysis and addresses whether, if there was a wrong,
>such as the use of excessive force, the officer made a reasonable
>mistake about the legal constraints on his actions and should
>therefore be protected against suit.

Curley v. Klem, 499 F.3d 199, 207 (3d Cir. 2007). Specifically, the second prong of the analysis seeks to determine "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202. The Supreme Court has cautioned that "[t]he relevant inquiry is the reasonableness of the officer's belief as to the appropriate level of force, which should be judged from the officer's on-scene perspective, and not in the 20/20 vision of hindsight." Curley, 499 F.3d at 206 (internal citations and quotation marks removed).

Courts are permitted to exercise discretion in deciding which of the two prongs of the Saucier analysis to be addressed first, or to only address the second prong, in light of the circumstances of the particular case. Pearson, 555 U.S. at 236. Qualified immunity is an immunity from suit rather than a defense to liability and should be resolved at the earliest possible stage in litigation. Id. at 237 (citation and quotation marks omitted). The question of "whether an officer made a reasonable mistake of law and is thus entitled to qualified immunity is a question of law that is properly answered by the court, not a jury." Curley, 499 F.3d at 211. However, when the issue of qualified immunity requires resolution of factual disputes, the court must defer consideration of immunity until the factual issues are resolved by a jury. Monteiro v. City of Elizabeth, 436 F.3d 397, 405 (3d Cir. 2006) citing Johnson v. Jones, 515 U.S. 304, 313 (1995). See McKoy v. Carter, No. 12-3055, 2013 WL 5788765, at *3 (3d Cir. Oct. 29, 2013) (finding that the district court properly denied appellant officers' summary judgment motion on

plaintiff's § 1983 excessive force claim after determining that the resolution of their entitlement to qualified immunity hinged on disputed facts regarding whether the officers' actions were reasonable in light of the facts and circumstances available to them at the time).

In the instant case, I have already found that the facts are in material dispute as whether plaintiff suffered an excessive force injury. Similarly, disputed facts also control the resolution of whether defendant Holmes is entitled to qualified immunity. Defendant's version of the facts indicates that the school officer was subject to a violent student who pushed, clutched her collar and kicked her in order to gain entrance into the library and she in response, grabbed her hair to keep her away. According to plaintiff's version of the facts, she was nonviolent and willing to leave the library but was pushed against a corner of a wall despite having told defendant that she would leave, then had her hair pulled and was bent over her stomach during which defendant allegedly professed indifference to her pregnant condition. Viewing the facts in the light most favorable to plaintiff, a reasonable jury could believe her version of the incident and conclude that defendant's use of force was unreasonable in light of the circumstances. I will therefore deny defendant Holmes the privilege of qualified immunity at this stage of the proceedings.

## II.     State Law Assault and Battery Claims

Defendants also seek summary judgment on plaintiff's state law claims for assault and battery. Under Pennsylvania law, an assault is "an intentional attempt by force to do an injury to the person of another, and a battery is committed whenever the violence menaced in an assault is actually done, though in ever so small a degree, upon the person." Renk v. City of Pittsburgh, 641 A.2d 289, 293 (Pa. 1994). "In making a lawful arrest, a police officer may use such force as is necessary under the circumstances to effectuate the arrest. The reasonableness of the force used in making the arrest determines whether the police officer's conduct constitutes an assault

and battery." Id. at 294.

The Pennsylvania Political Subdivision Tort Claims Act, 42 Pa. Cons. Stat. §§ 8541 & 8542, provides a general grant of immunity to agency officials in the course of their official duties with certain limited exceptions[14] that do not apply in the instant action. Employees of the School District of Philadelphia are entitled to the same immunities as their employer which is a local agency pursuant to the PSTCA. 42 Pa. Cons. Stat. § 8541. Under the PSTCA, local agencies are immune from liability "for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person." Id. With regard to an official's immunity, the statute provides that employees are liable to the "to the same extent as his employing local agency." 42 Pa. Cons. Stat. § 8545.

The PSTCA provides that an agency official may be held liable for acts that caused the injury and that such act "constitute[s] a crime, actual fraud, actual malice or willful misconduct." 42 Pa. Cons. Stat. § 8550. Willful misconduct has been defined by the Pennsylvania Supreme Court as "conduct whereby the actor desired to bring about the result that followed or at least was aware that it was substantially certain to follow, so that such desire can be implied." Sanford v. Stiles, 456 F.3d 298, 315 (3d Cir. 2006), citing Renk, 641 A.2d at 293. The Court of Appeals has made clear that willful misconduct is more than recklessness, deliberate indifference and the knowing disregard of risks, but instead requires "specific intent." Bright v. Westmoreland Cnty., 443 F.3d 276, 287 (3d Cir. 2006). Proof of conduct which exceeds the immunity protection under the PTSCA requires a "demanding level of fault." Sanford, 456 F.3d

---

[14] Section 8542 of the PSTCA permits recovery against a local agency or its employee for negligent acts if the act falls into one of the following eight categories: (1) vehicle liability; (2) care, custody or control of personal property; (3) real property; (4) trees, traffic controls and street lighting; (5) utility service facilities; (6) streets; (7) sidewalks; (8) care, custody or control of animals. 42 Pa. Cons. Stat. § 8542(b).

at 316.

      Holmes argues that the record is devoid of any evidence to establish that she acted with the requisite malice or deliberate intent required to strip her of her immunity under the PSTCA. Dkt. No. 11 at ECF p. 17. While plaintiff has produced no evidence of either a desire or intent on the part of Holmes to injure her, I find that plaintiff has produced enough evidence upon which a jury could find that her claimed injuries[15] were substantially certain to follow from defendant's conduct. The evidence includes Holmes's admission that plaintiff was "visibly" pregnant and the testimony of a student witness who said he heard Holmes say "I don't care, she grabbed my neck which was wrong" in response to a plea from plaintiff's friend to let go of plaintiff because of her pregnancy. Dkt. No. 12-5. Holmes can be liable for assault and battery in her individual capacity if a jury finds that the elements of the intentional torts are satisfied along with the willful use of an unreasonable amount of force. See Berete v. Cortazzo, No. 11-CV-4111, 2012 WL 6628040, at *6 (E.D. Pa. Dec. 18, 2012). Here, the reasonableness inquiry into an officer's use of force differs from the reasonableness inquiry in determining the eligibility for qualified immunity that I have discussed. Specifically, the difference is that reasonableness for the purposes of qualified immunity is an objective inquiry while the inquiry as to liability for intentional torts is a subjective one. See Hammock v. Borough of Upper Darby, No. 06-CV-

---

[15] These injuries included mild tenderness of her neck and back for a short period of time. Plaintiff testified that her scalp was "sore for a day or two" after the incident and "was still sore" although she received Tylenol at Aria Health, "like I couldn't touch my own head for some time but later on it went away." See Dkt. No. 11-2, 57: 20-59:23. However, plaintiff also contradictorily testified that "[a]fter that day when [doctors at Aria Health] wrote me a prescription for Tylenol . . . [ ] the pain was gone once I took it and after then it went away." Id. at 72:11-17. Aria Health's physician physical examination records note that plaintiff suffered "mild tenderness" of her back and neck but that there was "no swelling/tenderness" on her head two days after the altercation with defendant. Dkt. No. 12-3. Plaintiff's medical records do not suggest other injuries and is consistent with plaintiff's testimony that she was discharged after having been told that "everything was fine." See id. Plaintiff testified that "[t]he rest of the pregnancy was good" and her baby was born "normally." Dkt. No. 11-2 at 72:20-22.

1006, 2007 WL 3232115, at *10 (E.D. Pa. Oct. 31, 2007) ("In our [ ] analysis denying defendants qualified immunity, we established that <u>reasonable</u> officers would have understood their conduct to be unlawful.  The inquiry for purposes of PSTCA immunity, however, is whether <u>these</u> <u>particular</u> <u>officers</u> knew their conduct to be unlawful.") (emphasis in original).

"Since [the] PSTCA immunity differs from federal qualified immunity in that it is merely 'a defense to . . . liability rather than . . . a right to be free from suits,' this factual determination is one for a jury."  <u>Id.</u> at *10, <u>quoting</u> <u>In re City of Phila. Litig.</u>, 49 F.3d 945, 958 (3d Cir. 1995). Accordingly, I will deny defendants' motion because a genuine dispute of material fact exists with regards to plaintiff's state law claims of assault and battery.

An appropriate Order follows.